GAVIN WAYNE HOOPER
REG. NO. 73210-112
FCI BIG SPRING
FEDERAL CORR. INSTITUTION
1900 SIMLER AVE
BIG SPRING, TX  79720
Appearing *Pro Se*



FILED
CLERK, U.S. DISTRICT COURT

02/26/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___TJ___ DEPUTY

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

\*\*\*

GAVIN WAYNE HOOPER,

Movant,

vs.

UNITED STATES OF AMERICA,

Respondent.

Crim No. 2:16-cr-00147-JAK-1

**MOTION FOR COMPASSIONATE RELEASE/REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A) AND THE FIRST STEP ACT OF 2018**

COMES Movant, GAVIN WAYNE HOOPER ("Hooper"), appearing *pro se*, and respectfully moves the Court under 18 U.S.C. § 3582(c)(1)(A)(i) to modify his sentence and immediately release him to home confinement and a period of supervised release. The unprecedented threat of COVID-19 could not have been foreseen at sentencing, and poses extraordinary risks to Hooper's health. The virus thrives in densely packed populations, and the FCI is ill-equipped to contain the pandemic and prevent COVID-19 from becoming a *de facto* death sentence for Hooper. Hooper's diagnosed medical conditions make him especially vulnerable to the deadly risks of COVID-19. Allowing Hooper to finish out his sentence at home is the only prudent response to the extraordinary and compelling circumstances created by the novel coronavirus.

## I. JURISDICTION

The district court's jurisdiction to correct or modify a defendant's sentence is limited to those specific circumstances enumerated by Congress in 18 U.S.C. § 3582. The scope of a proceeding under 18 U.S.C. § 3582(c)(2) in cases like this one is extremely limited. *Dillon v. United States*, 130 S.Ct. 2683, 2687(2010). It is black-letter law that a federal court generally "may not modify a term of imprisonment once it has been imposed." *Id.* However, Congress has allowed an exception to that rule "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission." 18 U.S.C. § 3582(c)(2); see also, *Freeman v. United States*, 131 S.Ct. 2685 (2011) (reciting standard for sentence modifications). Such defendants are entitled to move for retroactive modification of their sentences. *Dillon*, 130 S.Ct. at 2690–91.

## II. PROCEDURAL HISTORY

On September 11, 2018, a grand jury sitting in the United States District Court for the Central District of California, Western Division, returned an eighteen (18) count Second Superseding Indictment charging Hooper. See Doc. 99.[1] Counts 1ss and 14ss charged Hooper with Felon in Possession of Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1). *Id.* Count 2ss charged Hooper with Unlawful Transfer of a Firearm, in violation of 26 U.S.C. § 5861(e). *Id.* Count 3ss charged Hooper with Possession with Intent to Distribute at Least 5 Grams of Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii). *Id.* Counts 4ss-7ss charged Hooper with Possession with Intent to Distribute Hydrocodone, Oxycodone, Hydromorphone, and Codeine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). *Id.* Counts 8ss-11ss charged Hooper with Possession with Intent to Distribute Carisoprodol, Alprazolam, Diazepam, and Clonazepam, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(2). *Id.* Count 12ss charged Hooper with Possession with Intent to Distribute Methamphetamine on Premises where Children are Present or Reside, in violation of 21 U.S.C. § 860a. *Id.* Count 13ss charged Hooper with Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and (B)(ii). *Id.* Count 15ss charged Hooper with Possession of Unregistered Firearms, in violation of 18 U.S.C. § 5861(d). *Id.* Count 16ss charged Hooper with Possession of Counterfeit Obligations of the United Sates With Intent to Defraud, in violation of 18 U.S.C. § 472. *Id.* Count 17ss charged Hooper with Possession with Intent to Distribute at Least 500 Grams of Cocaine, in violation of 21 U.S.C. § 841(a)(1) and

---

[1] "Doc." refers to the Docket Report in the United States District Court for the Central District of California, Western Division in Criminal No. 2:16-cr-00147-JAK-1, which is immediately followed by the Docket Entry Number. "PSR" refers to the Presentence Report in this case, which is immediately followed by the paragraph ("¶") number.

(b)(1)(B)(ii). *Id.* Count 18ss charged Hooper with Possession with Intent to Distribute Marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D). *Id.*

On March 20, 2019, a Change of Plea Hearing was held and Hooper entered a plea of guilty to Counts 1ss, 2ss, 3ss, 13ss, 14ss, 15ss, 16ss, 17ss of the Second Superseding Indictment, pursuant to a written Plea Agreement. See Docs. 133, 137.

On September 19, 2019, Hooper was sentenced to a total term of 169 months' imprisonment, 5 years of Supervised Release, no Fine or Restitution, and a Mandatory Special Assessment Fee of $800. See Docs. 150, 151.

### III. DISCUSSION

As a preliminary matter, Hooper respectfully requests that this Court be mindful that *pro se* complaints are to be held "to less stringent standards than formal pleadings drafted by lawyers," and should therefore be liberally construed. See *Pouncil v. Tilton*, 704 F.3d 568 (9th Cir. 2012); *Estelle v. Gamble*, 429 U.S. 97 (1976)(same); and *Haines v. Kerner*, 404 U.S. 519 (1972)(same).

A. **Hooper's Current Conditions of Confinement and Health Conditions.**

1. Defendant, Gavin Wayne Hooper, was sentenced in 2019 for being a felon Possession of Firearm and Ammunition (Counts 1ss and 14ss); Unlawful Transfer of a Firearm (Count 2ss); Possession with Intent to Distribute at Least 5 Grams of Methamphetamine (Count 3ss); Possession of Unregistered Firearms (Count 15ss); Possession of Counterfeit Obligations of the United Sates With Intent to Defraud (Count 16ss); and Possession with Intent to Distribute at Least 500 Grams of Cocaine (Count 17ss). This gave Hooper a total term of 169 months' imprisonment.

2. Hooper's projected release date is on December 17, 2031. However, he suffers from incurable, progressive disease, from which Hooper will never recover, to wit: Hypertension, Diabetes, and Irregular Heart Beat. He also suffers from sickle cell anemia, obesity, and needs biopsy as he had 4 lumps on his body upon his arrival to the BOP, which he now has additional 9 more lumps but has not seen medical to date. Hooper has four factors that make him more susceptible for an increased disease severity should he acquire COVID-19—high blood pressure, diabetic, high weight, and being a male. Reports from major COVID-19 epicenters including Wuhan, China, and Lombardy, Italy revealed higher morbidity and mortality rates among male patients with a history of hypertension, diabetes, and obesity.[2]

---

[2] See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html.

3

3.  Hooper, age 40, currently housed at Federal Correctional Institution, in Big Spring, Texas ("FCI Big Spring").

*Hypertension*. Hypertension is another name for high blood pressure. It can lead to severe health complications and increase the risk of heart disease, stroke, and sometimes death. Blood pressure is the force that a person's blood exerts against the walls of their blood vessels. This pressure depends on the resistance of the blood vessels and how hard the heart has to work. Hypertension is a primary risk factor for cardiovascular disease, including stroke, heart attack, heart failure, and aneurysm. Keeping blood pressure under control is vital for preserving health and reducing the risk of these dangerous conditions. Hypertension is a chronic disease. It can be controlled with medication, but it cannot be cured. Therefore, patients need to continue with the treatment and lifestyle modifications as advised by their doctor, and attend regular medical follow up, usually for life.

*Diabetes*. Diabetes is a serious condition that causes higher than normal blood sugar levels. Diabetes occurs when your body cannot make or effectively use its own insulin, a hormone made by special cells in the pancreas called islets (eye-lets). Insulin serves as a "key" to open your cells, to allow the sugar (glucose) from the food you eat to enter. Then, your body uses that glucose for energy. But with diabetes, several major things can go wrong to cause diabetes. Type 1 and type 2 diabetes are the most common forms of the disease, but there are also other kinds, such as gestational diabetes, which occurs during pregnancy, as well as other forms.

*Obesity*. Obesity is a complex disease involving an excessive amount of body fat. Obesity isn't just a cosmetic concern. It is a medical problem that increases your risk of other diseases and health problems, such as heart disease, diabetes, high blood pressure and certain cancers. Obesity is diagnosed when your body mass index (BMI) is 30 or higher. To determine your body mass index, divide your weight in pounds by your height in inches squared and multiply by 703. Or divide your weight in kilograms by your height in meters squared.[3]

B. **UNDER THE FIRST STEP ACT, THIS COURT HAS BROAD AUTHORITY TO DETERMINE WHETHER EXTRAORDINARY AND COMPELLING CIRCUMSTANCES EXIST TO MODIFY HOOPER'S SENTENCE AND RELEASE HIM TO HOME CONFINEMENT.**

The First Step Act ("FSA") expressly permits Hooper to move this Court to reduce his term of imprisonment and seek compassionate release. See 18 U.S.C. § 3583(c)(1)(A)(i). Under normal circumstances, a defendant can seek recourse through the courts after either (1) the BOP declines to

---

[3] Hooper is 5'9" in height, 230 pounds in weight. According to a Body Mass Index (BMI) calculator, his BMI is 34. Body mass index (BMI) is a measure of body fat based on height and weight that applies to adult men and women. At a BMI of 34, Hooper is at Obesity level I—which is defined as a BMI of 30-34.9. See https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html.

file such a motion on his behalf; or (2) there has been of lapse of 30 days from the warden's receipt of the defendant's request, whichever is earlier. *Id.* Although Hooper has not filed a request to the BOP yet, Hooper files this motion now in light of the urgent nature of this matter. See discussion, infra Part i. A.

After exhausting the administrative process, "a court may then 'reduce the term of imprisonment' after finding that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Ebbers*, 2020 WL 91399, at *4, 02-CR-1144 (VEC) (S.D.N.Y. Jan. 8, 2020), ECF No. 384. "In making its decision, a court must also consider "the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable."" *Id.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

While courts have noted that the Sentencing Commission's applicable policy statement on what constitutes "extraordinary and compelling reasons" to warrant a sentence reduction is anachronistic because it has not been updated since passage of the FSA, they still continue to be guided by the Sentencing Commission's descriptions of "extraordinary and compelling reason." See, e.g., *Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020). However, the Sentencing Commission's statements do not constrain the court's independent assessment of whether "extraordinary and compelling" reasons warrant a sentence reduction in light of the First Step Act's amendments. *United States v. Beck*, 2019 WL 2716505, at *5-6 (M.D.N.C. June 28, 2019); see also *Ebbers*, 2020 WL 91399, at *4. Indeed, "the district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release." *United States v. Young*, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) (collecting cases).

C. **The Unprecedented Nature of this Emergency Compels the Court to Find the Exhaustion Requirement Waived.**

The Court need not and should not wait for Hooper to exhaust administrative remedies under § 3582(c)(1)(A), as this will almost assuredly exacerbate an already impending public health catastrophe in our jails and prisons, while posing a particular and real danger to Hooper. See generally *Washington v. Barr*, 925 F.3d 109, 120-21 (2d Cir. 2019) ("[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile.").

Federal courts have found that they can hear applications prior to the expiration of 30 days (or the exhaustion of administrative remedies) if there is an emergency. See *United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT), ECF No. 642 (D. Mass. Mar. 17, 2020) (granting defendant's emergency motion based on COVID-19); see also *United States v. James Arberry*, No.

15 Cr. 594 (JPO), ECF No. 84 (S.D.N.Y. Nov. 12, 2019) (hearing and granting emergency compassionate release application of prisoner with cancer). This accords with general administrative law principles and the exception to administrative exhaustion requirements in numerous statutory schemes. See, e.g., *Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993) (waiving requirement to exhaust administrative remedies where "exceptional circumstances of peculiar urgency are shown to exist") (citing *Granberry v. Greer*, 481 U.S. 129 (1987)); *Washington v. Barr*, 925 F.3d 109, 119 (2d Cir. 2019) (finding that administrative exhaustion requirements can be waived if delay would cause irreparable injury); *Maxwell v. New York Univ.*, 407 F. App'x 524, 527 (2d Cir. 2010) (same).

"[A]pplication of the exhaustion doctrine is 'intensely practical'" and should "be guided by the policies underlying the exhaustion requirement." *Bowen v. City of New York*, 476 U.S. 467, 484 (1986) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 n.11 (1976)). Those policies were articulated by the Supreme Court in *Weinberger v. Salfi*, 422 U.S. 749 (1975):

> Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

422 U.S. at 765.

Conducting an "intensely practical" analysis of these policies in the context of the Social Security Act's exhaustion requirement, the Supreme Court held in *Bowen* that courts "should be especially sensitive" to irreparable and severe medical harm resulting for blind adherence to a statutory exhaustion requirement, particularly "where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the procedure they should have been afforded in the first place." 476 U.S. at 484 (discussing 42 U.S.C. § 405(g)); see also *Rafeedie v. I.N.S.*, 880 F.2d 506 (D.C. Cir. 1989) (Ginsburg, J., concurring) ("As I see it, a statutory exhaustion requirement, unless Congress explicitly declares otherwise, does not impose an absolute, unwaivable limitation on judicial review; instead, it sets a condition that may be excused when insistence on exhaustion would threaten grave harm to the party seeking review and would not sensibly serve the purposes Congress envisioned in establishing that condition.").

When coupled with the impending crisis, the unique exhaustion provision in § 3582(c)(1)(A) places this case squarely within *Bowen*'s holding. Under § 3582(c)(1)(A), exhaustion will "merely [ ] enable [Defendants] to receive the procedure they should have been afforded in the first place"—it will simply advance by what could be a crucial thirty days this Court's consideration of Hooper's motion for compassionate release. *Bowen*, 476 U.S. at 484. To wit, § 3582(c)(1)(A) provides that

motions for compassionate release are to be brought either by the "Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf . . . ." 18 U.S.C. § 3582(c)(1)(A) (emphasis added). In other words, § 3582(c)(1)(A)'s exhaustion requirement is not like other statutory exhaustion requirements, which expressly deprive federal courts of jurisdiction to hear disputes in the absence of exhaustion. *Cf. Booth v. Churner*, 532 U.S. 731, 736 (2001) (failure to exhaust under the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), means action cannot be maintained in federal court because that provision explicitly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." (emphasis added)).

Rather, § 3582(c)(1)(A) merely controls who (the BOP or the Defendant) moves for compassionate release before the Court, and when (now, or long after COVID-19 has already swept through FCI).

Congress' desire to avoid blind adherence to this "exhaustion" requirement is evidenced by the exception baked into § 3582(c)(1)(A), which provides that Defendants can bypass exhaustion altogether if the warden fails to act on an administrative application for compassionate release within 30 days. § 3582(c)(1)(A) ("[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . ." (emphasis added)). With this provision, Congress implicitly recognized that the policies underlying compassionate release are not furthered—and, indeed, actively frustrated—by excessive deference to bureaucratic process. Congress' concerns about delay are even more pronounced in the current public health crisis.

The policies underlying such requirements would not be furthered by strict adherence in this instance. Giving the BOP time to decide administrative applications for compassionate release predicated on COVID-19 concerns would not "afford the parties and the courts the benefit of [the BOP's] experience and expertise." *Salfi*, 422 U.S. at 765. The BOP already has provided its "expert" input on such requests: its "COVID-19 Action Plan" lacks any consideration whatsoever of compassionate release. See Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. And the FCI Legal Department has no institution-specific requirements for requesting compassionate release and no specific procedure

in place for compassionate release during this pandemic. Thus, it would be futile to force defendants to exhaust their administrative remedies—at the cost of their health and, potentially, their lives

As of February 11, 2021, we have 107,458,667 cases of COVID-19 and 2,357,475 deaths worldwide. The United States alone has 27,372,111 confirmed cases of COVID-19 and 472,626 deaths.

Recently, COVID-19 vaccine has been approved but supplies are limited. The Associated Press ("AP") reported in November 2020 that documents obtained from BOP revealed that although coronavirus rates were surging in inmate populations, vaccinations would be "reserved for staff" when they are received. When explaining its vaccination process, BOP said earlier on Tuesday it planned to offer vaccines to full-time bureau staff members, saying doing so "protects the staff member, the inmates at the facility, and the community." However, BOP spokesman Justin Long told the AP, "At this time, we can confirm high risk inmates in a few of the BOP facilities in different regions of the country have received the vaccine." The AP noted that BOP has not stated how many inmates have been vaccinated or what the selection process is. It is also unclear at this time how many doses of the vaccine BOP has received. The AP also reported that 3,624 federal inmates and 1,225 BOP staff members have tested positive for COVID-19 so far, with 171 inmate deaths due to the coronavirus.

Due to limited supplies, not everyone will be able to get a COVID-19 vaccine right away. Hence, the government and medical experts, advise that to protect yourself and help prevent spreading the virus to others, do the following:

- Wash your hands regularly for 20 seconds, with soap and water or alcohol-based hand rub;
- Cover your nose and mouth with a disposable tissue or flexed elbow when you cough or sneeze;
- Avoid close contact (1 meter or 3 feet) with people who are unwell; and
- Stay home and self-isolate from others in the household if you feel unwell.

**Note:** There are several different types of vaccines in development. All of them teach our immune systems how to recognize and fight the virus that causes COVID-19. Sometimes this process can cause symptoms, such as fever. These symptoms are normal and are a sign that the body is building protection against the virus that causes COVID-19. It typically takes a few weeks for the body to build immunity (protection against the virus that causes COVID-19) after vaccination. That means it's possible a person could be infected with the virus that causes COVID-19 just before or just after vaccination and still get sick. This is because the vaccine has not had enough time to provide protection. See https://www.cdc.gov/coronavirus/2019-ncov/vaccines/facts.html (last accessed
8

January 13, 2021).

With the speed and unpredictability of this pandemic worldwide—now U.S. is the epicenter of the pandemic—waiting even 30 days will be too late. Accordingly, this Court should exercise jurisdiction over Hooper's emergency motion for compassionate release and dispense with the BOP requirements under 18 U.S.C. § 3582(c)(1)(A)(i).

Indeed, in *United States v. Wilson Perez*, 17 Cr. 513 (AT) (S.D.N.Y. Apr. 1, 2020), ECF No. 98, the Honorable Analisa Torres deemed the exhaustion requirement waived, and held that all three exceptions (futility, incapability, and prejudice) apply to the instant circumstances. See also *United States v. Latrice Colvin*, No. 19 Cr. 179 (JBA) (D. Conn. Apr. 2, 2020), ECF No. 38 (granting compassionate release and waiving exhaustion requirement); *United States v. Zukerman*, 16 Cr. 194 (AT), 2020WL1659880 (S.D.N.Y. Apr. 3, 2020), at *2 (same); *United States v. Powell*, 94 Cr. 316 (D.D.C. Mar. 28, 2020), ECF No. 98 (same).

**D.    "Extraordinary and Compelling Reasons" Warrant a Reduction in Hooper's Sentence.**

   1.    COVID-19 Is a Public Health Disaster That Threatens Vulnerable Incarcerated Persons like Hooper.

The COVID-19 pandemic continues to roil the United States. As February 11, 2021, the BOP has 123,761 federal inmates in BOP-managed institutions and 13,824 in community-based facilities. The BOP staff complement is approximately 36,000. There are 1,620 federal inmates and 1,674 BOP staff who have confirmed positive test results for COVID-19 nationwide. There have been 220 federal inmate deaths and 4 BOP staff member deaths attributed to COVID-19 disease. Specifically, there are 6 federal inmates and 11 BOP staff who have confirmed positive test results for COVID-19, and 3 federal inmates deaths attributed to COVID-19 disease at FCI Big Spring. See https://www.bop.gov/coronavirus/ (last accessed February 11, 2021). Bottom line, Federal facilities are not immune.

Conditions of confinement create an ideal environment for the transmission of highly contagious diseases like COVID-19. Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons. Inmates share small cells, eat together and use the same bathrooms and sinks. . . . . They are not given tissues or sufficient hygiene supplies"); Joseph A. Bick (2007). *Infection Control in Jails and Prisons*. Clinical Infectious Diseases 45(8):1047-1055, at https://academic.oup.com/cid/article/45/8/1047/344842 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"). BOP employees are complaining that they

lack masks and gloves, hand sanitizer, and even soap.

"The [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . . We don't know who's infected." *Manrique*, 2020 WL 1307109, at *1.10

Indeed, as the Second Circuit recently observed, present information about the COVID-19 epidemic and the BOPs' prior failings in 2019 to adequately protect detainees and allow them access to counsel and their families following a fire and power outages suggest that the virus' impact will likely be "grave and enduring." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, No. 19-1778, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020).

    2.    <u>Hooper's Vulnerability to COVID-19 Due to His High Medical Risk Is an Extraordinary and Compelling Reason That Warrants a Sentence Reduction.</u>

On March 11, 2020, the World Health Organization ("WHO") officially classified the new strain of coronavirus, COVID-19, as a pandemic. On March 13, 2020, the White House declared a national emergency under Section 319 of the Public Health Service Act, 42 U.S.C. § 247(d)).[4] Subsequently, on March 16, 2020, the White House issued guidance recommending that, for the next eight weeks, gatherings of ten persons or more be canceled or postponed.[5] These drastic measures followed the issuance of a report by British epidemiologists that 2.2 million Americans could die without drastic intervention to slow the global spread of the deadly COVID-19 virus. *Id.*

Hooper is particularly vulnerable to COVID-19 because of his medical condition: hypertension, diabetes, and obesity. At the time of sentencing, the Court could not have anticipated that Hooper's diseases will place him in the "high risk" category nor the existence of the COVID-19. As the COVID-19 pandemic continues, it potentially poses a particular issue for older people and people with pre-existing medical conditions (such as serious heart condition, lung disease, and autoimmune disease) appear to be more vulnerable to becoming severely ill with the COVID-19 virus.

*Lung Problems, Including Asthma*

COVID-19 targets the lungs, so you're more likely to develop severe symptoms if you have preexisting lung problems, such as: Moderate to severe asthma, Chronic obstructive pulmonary

---

[4] The White House, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[5] Sheri Fink, White House Takes New Line After Dire Report on Death Toll, N.Y. Times (Mar. 17, 2020), https://www.nytimes.com/2020/03/16/us/coronavirus-fatality-rate-white-house.html

disease (COPD), Lung cancer, Cystic fibrosis, Pulmonary fibrosis. In addition to being an asthma trigger, smoking or vaping can harm your lungs and inhibit your immune system, which increases the risk of serious complications with COVID-19.

*Heart Disease, Diabetes and Obesity*

People with diabetes, heart disease, high blood pressure or severe obesity are more likely to experience dangerous symptoms if infected with COVID-19. This may be of particular concern in the United States, which has seen increasing rates of obesity and diabetes over the years.

Obesity and diabetes both reduce the efficiency of a person's immune system. Diabetes increases the risk of infections in general. This risk can be reduced by keeping blood sugar levels controlled and continuing your diabetes medications and insulin. Your risk of serious illness may also be higher if you have heart diseases such as cardiomyopathy, pulmonary hypertension, congenital heart disease, heart failure or coronary artery disease.

Obesity is a risk factor for a more severe illness from COVID-19.[6] In the first meta-analysis of its kind, published in Obesity Reviews, an international team of researchers pooled data from scores of peer-reviewed papers capturing 399,000 patients. They found that people with obesity who contracted COVID-19 were 113% more likely than people of healthy weight to land in the hospital, 74% more likely to be admitted to an ICU, and 48% more likely to die.[7] A more localized study of individuals in New York found that of 5700 patients with obesity in New York City showed that 41.7% of COVID 19 hospitalized patients were individuals with obesity,[8] whereas the average prevalence of individuals with obesity in New York City was 22.0%.[9] Scientists believe that obesity impairs immunity, causes chronic inflammation, and increases the chances of blood clots—all of which can worsen COVID-19.[10] And studies have shown that severe obesity puts those with

---

[6] See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#obesity

[7] See Popkin B., Du S., Green W., Beck M., Algaith T., Herbst C., Alsukait R., Alluhidan M., Alazemi N., Shekar M. Individuals with obesity and COVID 19: A global perspective on the epidemiology and biological relationships. Obesity Reviews. Vol. 21, Issue 11. (26 Aug 2020). https://onlinelibrary.wiley.com/doi/full/10.1111/obr.13128

[8] See Richardson S, Hirsch JS, Narasimhan M, et al. Presenting characteristics, comorbidities, and outcomes among 5700 patients hospitalized with COVID 19 in the New York City area. JAMA. 2020;323(20):2052–2059.

[9] See NYC Department of Health and Mental Hygiene. Individuals with obesity. 2020.

[10] See Wadman, Meredith. Why COVID-19 is more deadly in people with obesity—even if they're Young. Science, Sept. 2020. (Available at: https://www.sciencemag.org/news/2020/09/

COVID-19 at particularly high risk of death, more so than related risk factors such as diabetes or hypertension.[11] Obesity is especially dangerous for men and younger patients who contract COVID-19.

### *How SARS-COV-2 Causes Disease and Death in COVID-19*

"You'd think underlying lung problems or immune system problems will be the greatest risk," says Dr. Levitt. "But it seems the biggest risk factors have been hypertension, diabetes and obesity." That has led many scientists to suspect that the profound inflammation seen in severe cases of COVID-19 may be yet another problem linked to SARS-COV-2's fondness for ACE2. People with diabetes, hypertension and heart disease have more ACE2 on their cells as a response to the higher levels of inflammation that come with their condition; ACE2 has an anti-inflammatory effect. When SARS-COV-2 sticks to ACE2 and reduces its ability to do its job, the underlying inflammation gets worse.

When inflammation gets completely out of control the body enters what is called a cytokine storm. Such storms drive the most severe outcomes for COVID-19, including multi-organ failure. There is thus an obvious role for anti-inflammatory drugs. But knowing when to administer them is hard. Go too late, and the storm will be unstoppable; go too early, and you may dampen down an immune response that is turning the tide. A recent article in the Lancet suggests that it would help if COVID-19 patients were routinely screened for hyper-inflammation to help identify those who might benefit from anti-inflammatory drugs. But not everyone is convinced today's drugs have much to offer. "We tried [a range of anti-inflammatory treatment] and it actually didn't work," says Rajnish Jaiswal, who has been working on the front line of COVID-19 treatment at New York's Metropolitan Hospital.

https://www.economist.com/briefing/2020/06/06/how-sars-cov-2-causes-disease-and-death-in-covid-19.

### *Gender*

Additionally, Hooper is male. Studies of COVID-19 patients found that males of all ages had significantly higher proportion of more serious diseases than females. There is also an increased correlation in severity of symptoms in men with obesity. In the largest multi-center, retrospective cohort study that comprehensively describes the clinical features of COVID-19, it was found that males with hypertension had an

---

why-covid-19-more-deadly-people-obesity-even-if-theyre-young).

[11] See Tartof SY, Qian L, Hong V. Obesity and mortality among patients diagnosed with COVID-19: results from an integrated health care organization. Ann Intern Med. Published online August 12, 2020. doi:10.7326/M20-3742. (Available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7429998/).

increased proportion of critical illness across ages.[12] And advanced age and male sex had been reported as risk factors of mortality in SARS, MERS, and COVID-19.[13]

A person's sex, meaning their underlying biological make-up, determines both immunological and hormonal profiles that may be important in responding to infection. These differences in the biological responses of males and females might be important in determining clinical outcomes in COVID-19. For example, it is thought that an enzyme called ACE2 (enzyme 2) is important in the risk of developing severe COVID19 disease. ACE2 sits on cell membranes and may allow the virus to enter cells more easily, and hence begin its destructive pathway through the body's vital organs. Levels of ACE2 are generally higher in men, meaning more cells may be vulnerable to the virus, and this, in turn, may lead to men's higher risk of severe COVID outcomes and death.[14]

On whole, Hooper has four risk factors—that when combined together—place him at a much higher risk for complications related to COVID-19—his hypertension, diabetes, obesity, and his gender.

These are "extraordinary and compelling reasons" for his release. See Note 1(A), § 1B1.13 (expressly recognizing that "other reasons" may exist for granting compassionate release), see Note 1(D), § 1B1.13 Note 1(D) (recognizing that extraordinary and compelling reasons exists "other than, or in combination with, the reasons described in subdivisions (A) through (C)."). Here, Hooper's high susceptibility to COVID-19 falls within the purview of this catchall. Moreover, courts have noted that while § 1B1.13 provides "helpful guidance" for determining what constitutes an extraordinary and compelling reason to warrant a sentence reduction, the inquiry does not end there. Rather, district courts have the freedom to shape the contours of what constitutes an extraordinary and compelling reason to warrant compassionate release. Given the highly infectious nature of COVID-19, the inability in a facility like FCI to practice any of the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and the fact that Hooper suffers from ailments that have already been identified as "high risk," this Court should find that Hooper's legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.

---

[12] See Liu D., Chui P., Zeng S., Wang S., Feng X, Xu S., et. al. Risk factors for developing into critical COVID-19 patients in Wuhan, China: A multicenter, retrospective, cohort study. EClinicalMedicine. Vol. 25 Aug. 2020. (Available at: https://www.thelancet.com/journals/ eclinm/article /PIIS2589-5370(20)30215-7/fulltext)

[13] See Zhou F., Yu T., Du R., et al. Clinical course and risk factors for mortality of adult inpatients with COVID-19 in Wuhan, China: a retrospective cohort study. The Lancet. 2020; 395: 1054-1062.

[14] See https://globalhealth5050.org/the-sex-gender-and-covid-19-project/men-sex-gender-and -covid-19/

Hence, it is appropriate for Hooper to be released into an environment where he and his loved ones can control and direct his medical care. It is important for all of us to remember that convicted criminals are sent to prison as punishment—not for punishment. People who are severely debilitated or are in the midst of dying are usually no longer a threat to society, and there is not a compelling social advantage to keeping them in prison.

Finally, in the last few months, other jails and prisons have already started to proactively release elderly and sick inmates who are at high risk of infection, as well as releasing as many nonviolent offenders as possible in an effort to reduce the incarcerated population and thus reduce the risk of spread. For example, on March 25, 2020, New York City announced that it would release 300 inmates from Rikers Island. Approximately 1,700 inmates have been released from Los Angeles County Jails, and 1,000 inmates are to be released from New Jersey jails. Therefore, while COVID-19 remains an unprecedented emergency, many states (and politicians) have recognized that they have a duty to flatten the curve inside incarcerated spaces. So, too, should this Court.

### 3. Courts Have Granted Compassionate Release in Light of the Instant Pandemic.

Courts in the Southern and Eastern Districts of New York have granted compassionate release based on COVID-19. See *United States v. Wilson Perez*, No. 17 Cr. 513 (AT) (S.D.N.Y. Apr. 1, 2020), ECF No. 98, (granting release based on health issues and finding court could waive exhaustion requirement; government did not object based on defendant's medical conditions); *United States v. Mark Resnick*, No. 12 Cr. 152 (CM) (S.D.N.Y. April 2, 2020), ECF No. 461 (granting compassionate release because of defendant's age and medical conditions in light of COVID-19); *United States v. Eli Dana*, No. 14 Cr. 405 (JMF) (S.D.N.Y. Mar. 31, 2020), ECF No. 108 (granting compassionate release motion, where government consented, because of defendant's age and medical conditions and the risk posed by COVID-19); *United States v. Damian Campagna*, No. 16 Cr. 78 (LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020) (granting compassionate release sentencing reduction to defendant convicted of firearms offenses based on defendant's health and threat he faced from COVID-19; government consented to reduction and agreed health issues and COVID-19 were basis for relief); *United States v. Daniel Hernandez*, No. 18 Cr. 834 (PAE) (S.D.N.Y. Apr. 1, 2020), ECF No. 446 (granting compassionate release after BOP denied the request and converting remaining sentence to home confinement); *United States v. Jose Maria Marin*, No. 15 Cr. 252 (PKC) (E.D.N.Y. Mar. 30, 2020), ECF No. 1325-1326 (waiving exhaustion requirement and granting compassionate release to defendant based on special risks he faced from COVID-19).

So, too, have courts across the country. See *United States v. Andre Williams*, No. 04 Cr. 95 (MCR) (N.D. Fla. Apr. 1, 2020) (granting release based on defendant's health and COVID-19); *United States v. Teresa Ann Gonzalez*, No. 18 Cr. 232 (TOR) (E.D. Wa. Mar. 25, 2020), ECF No. 834 (waiving any further exhaustion attempts as futile and granting compassionate release based on defendant's health issues and COVID-19 pandemic); *United States v. Jeremy Rodriguez*, No. 03 Cr. 271 (AB) (E.D. Pa. Apr. 1, 2020), ECF No. 135 (finding court has independent authority to determine "extraordinary and compelling" reasons and granting compassionate release based in part on defendant's health and COVID-19; no exhaustion issue because 30 days had passed); *United States v. Pedro Muniz*, No. 09 Cr. 199 (S.D. Tex. Mar. 30, 2020), ECF No. 578 (granting compassionate release based on health conditions that made inmate susceptible to COVID-19); *United States v. Samuel H. Powell*, No. 94 Cr. 316 (ESH) (D.D.C. Mar. 27, 2020), ECF No. 97 (granting compassionate release for 55-year old defendant with respiratory problems in light of outbreak, without waiting for 30 days or other exhaustion of administrative remedies through the BOP); *United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT) (D. Mass. Mar. 17, 2020), ECF No. 642 (granting defendant's emergency motion based on COVID-19); *US v. Foster*, No. 1:14-cr-324-02 (M.D. Pa. Apr. 3, 2020) ("The circumstances faced by our prison system during this highly contagious, potentially fatal global pandemic are unprecedented. It is no stretch to call this environment 'extraordinary and compelling,' and we well believe that, should we not reduce Defendant's sentence, Defendant has a high likelihood of contracting COVID-19 from which he would "not expected to recover." USSG §§ 1B1.13. No rationale is more compelling or extraordinary."); *US v. Powell*, No. 1:94-cr-0316-ESH (D.D.C. Mar. 24, 2020), Recommendation, Dkt. 94 (Court recommendation to BOP to immediately place defendant, who is 55-years old and suffers from several respiratory problems (including asthma and sleep apnea) into home confinement to serve the remainder of his prison term); *United States v. Tran*, No. 8:08-cr-00197-DOC, 2020 WL 1820520 (C.D. Cal. Apr. 10, 2020) (Order re: Motion Emergency Motion to Reduce Sentence, granting compassionate release in part based on COVID-19), Dkt. 405; *United States v. Burrill*, No. 17-cr-00491-RS-2, 2020 WL 1846788 (N.D. Cal. Apr. 10, 2020) (Order Granting Emergency Motion for [Compassionate] Release, based in part on COVID-19), Dkt. 308; *United States v. Arreola-Bretado*, No. 3:19-cr-03410-BTM, 2020 WL 2535049 (SD Cal. May 15, 2020) (Order re: Motion Emergency Motion to Reduce Sentence, granting compassionate release in part based on COVID-19).

See also *US v. Colvin*, No. 3:19cr179 (JBA), 2020 WL 1613943 (D. Conn. Apr. 2, 2020) ("She has diabetes, a 'serious ... medical condition,' which substantially increases her risk of severe

15

illness if she contracts COVID-19.... Defendant is 'unable to provide self-care within the environment of' FDC Philadelphia in light of the ongoing and growing COVID-19 pandemic because she is unable to practice effective social distancing and hygiene to minimize her risk of exposure, and if she did develop complications, she would be unable to access her team of doctors at Bridgeport Hospital. In light of the expectation that the COVID-19 pandemic will continue to grow and spread over the next several weeks, the Court concludes that the risks faced by Defendant will be minimized by her immediate release to home, where she will quarantine herself.")

Here, although those factors fully support the substantial sentence originally imposed, in the current context of Hooper's incurable medical condition, Hooper's family believes compassionate release is appropriate at this time.

Hooper was never convicted of a sex offense, nor did he ever try to escape. It is essential to also note that since Hooper's incarceration began, he has taken numerous steps to attempt to improve himself in "post-conviction rehabilitation." Based on his medical condition and the world's take on the global pandemic right now, and good time credits he has served, Hooper have met all the requirements for compassionate release.

If granted compassionate release, Hooper will reside with his family– where he will be able to isolate himself and take the same precautionary measures that all Americans are taking: frequent hand washing, sanitizing his living space, and seeking medical care if necessary. None of these precautions are available in prison. Further information about these release plans upon request.

## IV. CONCLUSION

For the above and foregoing reasons, Hooper prays this Court would consider his Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A) and First Step Act of 2018, based upon the "extraordinary and compelling reasons" and release him to home confinement or hold a hearing as soon as possible.

Respectfully submitted,

Dated: February 22, 2021.

GAVIN WAYNE HOOPER
REG. NO. 73210-112
FCI BIG SPRING
FEDERAL CORR. INSTITUTION
1900 SIMLER AVE
BIG SPRING, TX 79720
Appearing *Pro Se*

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2021, a true and correct copy of the above and foregoing Motion for Compassionate Release/Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) and the First Step Act of 2018 was sent via U. S. Mail, postage prepaid, Karen Escalante, Assistant U.S. Attorney at U.S. Attorney's Office, General Crimes Section 312 North Spring Street Suite 1200, Los Angeles, CA 90012.

GAVIN WAYNE HOOPER

**PRIORITY® MAIL**

**FROM:**

GAVIN WAYNE HOOPER
REG. NO. 73210-112
FCI BIG SPRING
FEDERAL CORR. INSTITUTION
1900 SIMLER AVE
BIG SPRING, TX  79720

**TO:**

Ms. Kiry K. Gray
Clerk of Court
U. S. District Court
Central District of California
Western Division (Los Angeles)
255 East Temple Street
Los Angeles, CA 90012-3332

RECEIVED
CLERK, U.S. DISTRICT COURT
FEB 26 2021
CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

Retail
US POSTAGE PAID
$7.95
Origin: 77070
02/22/21
4800420059-01
MAIL 2-DAY®
0 Lb 4.40 Oz
1006
DELIVERY: 02/25/21
C032